## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDGE ROTENBERG EDUCATIONAL CENTER, INC., *et al.*, | |
| Plaintiffs, | Civil Action No. 17-2092 (BAH) |
| v. | Judge Beryl A. Howell |
| U.S. FOOD AND DRUG ADMINISTRATION, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

Judge Rotenberg Education Center, Inc. ("JRC"), a non-profit center for "patients who engage in self-injurious and aggressive behaviors," provides a treatment regimen for some patients that involves the use of a Graduated Electronic Decelerator ("GED")—an "electronic stimulation device."  Compl. ¶¶ 1, 4, ECF No. 1.  In April 2016, the Food and Drug Administration ("FDA"), a component of the Department of Health and Human Services ("HHS"), published a proposed rule, seeking to ban the use of GED.  *See* Proposal to Ban Electrical Stimulation Devices Used to Treat Self-Injurious or Aggressive Behavior ("Proposed Rule"), 81 Fed. Reg. 24,386 (Apr. 25, 2016).  Shortly thereafter, starting in July of 2016, JRC, along with JRC Parents and Friends Association, Inc. ("Parents Association"), and Paul E. Peterson ("Peterson"), a father of an adult patient at JRC and a member of the Parents Association (collectively "plaintiffs"), submitted requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, to the FDA for records related to the Proposed Rule, JRC, and electronic stimulation devices, *see* Compl. ¶¶ 23, 35, 48, 55-60.

In the intervening nine years since plaintiffs submitted their FOIA requests, much has happened: plaintiffs filed the instant lawsuit, *see generally* Compl.; the defendants produced over 100,000 pages of responsive records, *see* Defs.' Comb. Reply Supp. Summ. J. & Opp'n Pls.' Cross-Mot. Summ. J. ("Defs.' Reply") at 1, ECF No. 76; the parties' partial cross-motions for summary judgment were resolved regarding records defendants withheld in full or in part based on an array of FOIA exemptions, *see generally JRC v. U.S. Food & Drug Admin.* ("*JRC I*"), 376 F. Supp. 3d 47 (D.D.C. 2019) (granting in part and denying in part defendants' and plaintiffs' partial cross-motions for summary judgment); the FDA implemented a final rule banning the use of GED, which the D.C. Circuit later vacated, *see generally JRC v. U.S. Food & Drug Admin.*, 3 F.4th 390 (D.C. Cir. 2021); and, finally, the parties filed the instant cross-motions for summary judgment, *see* Defs.' Mot. Summ. J. ("Defs.' MSJ"), ECF No. 50, Pls.' Cross-Mot. Summ J. ("Pls.' XMSJ"), ECF No. 71.  The briefing, exhibits, affidavits, and indices filed in connection with the pending cross-motions span thousands of pages, but, after ripening, the parties' dispute has winnowed down to two legal issues: first, whether the FDA, as a matter of law, may invoke FOIA's Exemption 5, 5 U.S.C. § 552(b)(5), to assert the deliberative process and attorney-client privileges to withhold responsive documents, in whole or in part, in light of the D.C. Circuit's vacatur of the FDA's final rule banning GED, *see* Pls.' Mem. Supp. XMSJ ("Pls.' Opp'n") at 11-31, ECF No. 71-7; Defs' Reply at 6-12; and, second, whether defendants have satisfied the FOIA Improvement Act's foreseeable harm standard for the records at issue in the instant cross-motions*, see* Pls.' Opp'n at 32-40; Defs.' Reply at 16-22.[1]

---

[1]      The memoranda filed in support of many of these motions are docketed twice and, to simplify citation, only one of the duplicate memoranda is cited.  For example, plaintiffs' memorandum in support of its cross-motion for summary judgment and opposition to defendants' motion for summary judgment is docketed twice, at ECF Nos. 71 and 72; only the memorandum at ECF No. 71 is cited.  Defendants' memorandum in support of the motion for summary judgment and in opposition to plaintiffs' cross-motion are docketed at ECF Nos. 76 and 77, and only the memorandum at ECF No. 76 is cited.  Furthermore, given the size of the file, the declarations and exhibits plaintiffs filed in support of their cross-motion is docketed at ECF No. 70.

For the reasons explained below, defendants' motion for summary judgment is granted, and plaintiffs' cross-motion for summary judgment is denied.[2]

## I.    BACKGROUND

The underlying facts were described at length in *JRC I*, 376 F. Supp. 3d at 53-58, and only those facts and procedural history relevant to the instant motion are summarized here.

### A.    Factual Background

"JRC is a residential program" that treats patients who "engage in . . . self-injurious behavior . . . and aggressive behavior."  Pls.' Statement Material Facts ("Pls.' SMF") ¶ 1, ECF No. 71-6.[3]  JRC treats some of its patients, "who engage in life-threatening" self-injurious and aggressive behavior, with the GED, which is an electrical stimulation device.  *Id.* ¶ 4.  For each patient receiving this treatment, a probate judge has determined that electrical stimulation "is the most effective, least-restrictive treatment for the patient's behavior disorder."  *Id.* ¶ 6.

On April 5, 2016, the FDA proposed a rule that would ban the use of GED to treat self-injurious or aggressive behavior.  *See* Proposed Rule, 81 Fed. Reg. 24,386 (Apr. 25, 2016).  Over a six-month period, plaintiffs submitted four FOIA requests targeting information relating to the Proposed Rule.  First, on July 19, 2016, Peterson filed six identical FOIA requests to the FDA and five of its components, which the FDA consolidated for processing consistent with internal regulations ("First Request").  Defs.' Statement Material Facts ("Defs.' SMF") ¶¶ 2-3, ECF No. 50-2.  The request sought records about "FDA inspections of JRC; the Neurological Devices

---

[2]        Plaintiffs have requested a hearing, *see* Pls.' Opp'n, but that request is denied as unnecessary given the voluminous record in this case.  LCvR 7(f) (authorizing oral hearings at "the discretion of the Court").  Likewise, given the voluminous record, detailed *Vaughn* indices and affidavits, and the fact that resolution of the parties' dispute principally revolves around questions of law, plaintiffs' request that the Court review records *in camera*, Pls.' Opp'n at 41, is denied.  *See Mobley v. CIA*, 806 F.3d 568, 588 (D.C. Cir. 2015) ("*[I]n camera* review is of little help when the dispute centers not on the information contained in the documents but on the parties' differing interpretations as to whether the exemption applies to such information.").

[3]        Unless otherwise noted, the facts relied upon to resolve the instant motions are not disputed.

Panel of the Medical Devices Advisory Committee; and the FDA's proposed ban of [electronic stimulation devices]," among other things. *Id.* ¶ 2. Second, on August 23, 2016, Peterson sent two additional FOIA requests to the FDA, seeking, *inter alia*, records dating back to 2012 of meetings between FDA employees and stakeholders interested in electrical stimulation devices; of communications between the FDA and other divisions of HHS about electrical stimulation devices; of literature analyzing electrical stimulation devices that the FDA received or created; and of communications or records between FDA employees and former patients of JRC ("Second Request"), *id.* ¶ 4, and "materials related to expert opinions from three individuals about electrical stimulation devices" ("Third Request"), *id.* ¶ 5. Finally, on December 27, 2016, JRC submitted a letter, later joined by the Parents Association, that the FDA treated as a FOIA request seeking "information related to statements made in FDA's Federal Register notice announcing a proposed ban on electrical stimulation devices" ("Fourth Request"). *Id.* ¶ 6.

### B.      FDA's Processing of Plaintiffs' FOIA Requests

As described previously, *see JRC I*, 376 F. Supp. 3d at 55-56, when the FDA receives a FOIA request, its Division of Freedom of Information ("DFOI") directs the request to the FDA components most likely to possess responsive records and locates any responsive records that have been previously produced in response to separate FOIA requests. Defs.' SMF ¶¶ 7, 11-12. In this case, DFOI identified the following FDA components as likely possessing responsive records to the First, Second, and Fourth Requests: the Office of the Chief Counsel ("OCC"), the New England District Office, the Center for Devices and Radiological Health's ("CDRH") Division of Information Disclosure, and the Office of Regulatory Affairs ("ORA"). *Id.* ¶¶ 16-19. In addition, two HHS divisions outside the FDA were asked to produce responsive records to the same three requests. *Id.* ¶ 20. DFOI identified only CDRH as the component likely to possess responsive records to the Third Request. *Id.* ¶ 18. On February 2, 2018, after a hearing, the

proceedings were bifurcated between non-CDRH components and CDRH, setting deadlines for briefing partial summary judgment on records produced from non-CDRH components, while requiring production from CDRH to proceed on a rolling basis.  Bifurcation Order (Feb. 2, 2018); Min. Entry (Feb. 2, 2018).

###### 1.    *Non-CDRH Records*

Between September 2016 and July 2018, all non-CDRH components completed their search for responsive records and produced 24,241 pages of records.  *JRC I*, 376 F. Supp. 3d at 56.  Of those pages, approximately 12,642 pages were redacted in full, and another 1,340 pages were redacted in part.  *Id*.  To support the withholdings, defendants filed a 1,979-paged *Vaughn* index, *see Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), with a "Bates-stamp number, a description, the document's date, author and recipients, whether the document was withheld in part or in full, the basis for any withholding, and the number of pages fully withheld."  *JRC I*, 376 F. Supp. 3d at 57-58.  The index confirmed that defendants withheld records under (1) FOIA Exemption 5's safeguard for the deliberative process and attorney-client privileges, 5 U.S.C. § 552(b)(5); (2) Exemption 6's shield for personnel, medical, and similar files, "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," *id.* § 552(b)(6); and (3) Exemption 7(c)'s protection for law enforcement records that "could reasonably be expected to constitute an unwarranted invasion of privacy," *id.* § 552(b)(7)(C).  *JRC I*, 376 F. Supp. 3d at 57.

In line with the bifurcation order, the parties briefed motions for partial summary judgment regarding the non-CDRH records and those motions were granted in part and denied in part.  *See generally JRC I*, 376 F. Supp. 3d 47.  Specifically, summary judgment was granted to defendants with respect to: (1) material withheld under Exemption 5's attorney-client privilege, *id.* at 62 n.4; (2) draft records withheld under Exemption 5's deliberative process privilege, *id.* at

71; (3) personal information of low-level JRC employees and contact information of government employees withheld under Exemption 6, *id.* at 72 n.10; and (4) material withheld under Exemption 7(C), *id.* at 74 n.11. *See also id.* at 76. Defendants were also granted summary judgment for releasing all segregable non-exempt material in documents that fell within the preceding four categories. *Id.* at 75. At the same time, plaintiffs were granted summary judgment as to: (1) material withheld as nonresponsive and not otherwise withheld under one of FOIA's statutory exemptions, *id.* at 62[4]; and (2) the withholding of the identity of a JRC employee interviewed by CBS in the document bearing the Bates-stamp "JRC OES Supplemental 1 005549-53," *id.* at 77. The parties' cross-motions were denied in all other respects. *See id.* at 76-77. For all withholdings based on Exemption 5's deliberative process privilege as to which defendants were not granted summary judgment, defendants were directed to (a) "update their *Vaughn* indices to identify with adequate specificity the agency decision to which a record relates," *id.* at 67, and (b) "explain the dynamic between the author or individual sending, and the individual receiving, the withheld record at issue" by, for example, stating whether a record is "from a subordinate to a superior, from a superior to a subordinate, or . . . from peer to peer," *id.* at 69. For all withholdings based on Exemption 6 as to which neither party was granted summary judgment, defendants were directed to "take a more nuanced approach" to considering the privacy and public interests required to be balanced. *Id.* at 74.

---

[4]    Defendants reclassified fifty-one records midway through litigation as "nonresponsive," even though the records remained on the defendants' prior final version of its non-CDRH *Vaughn* index. *JRC*, 376 F. Supp. 3d at 59-62. "[R]eclassifying records midway through litigation," *id.* at 62, however, "is improper," *id.* Accordingly, defendants were ordered to "release all records . . . listed on the [prior final non-CDRH] *Vaughn* Index as being withheld for non-responsiveness that [were] not also subject to a FOIA statutory exemption." *Id.*

## 2. *Post*-**JRC I** *Developments Regarding non-CDRH Records*

After partial grant and denial of the parties' cross-motions for summary judgment, defendants produced the records as to which plaintiffs were granted summary judgment, including all purportedly "non-responsive" material, *see supra* n.4, and "JRC OES Supplemental 1 005549-53" with the formerly redacted employee's name revealed.  *See* Joint Status Report ("JSR") at 6, ECF No. 41; JSR at 5, ECF No. 44.  The parties also conferred to narrow their disputes over other redactions to non-CDRH records, and defendants released additional material to plaintiffs.  Specifically, defendants produced material previously withheld under Exemption 6, *see* Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem."), 2d Suppl. Decl. Barbara A. Recupero ("Recupero 2d Suppl. Decl.") ¶ 6, ECF No. 50-8; Defs.' Mem., Suppl. Decl. David Mednick ("Mednick Suppl. Decl.") ¶ 5, ECF No. 50-7, and plaintiffs agreed not to challenge defendants invocation of Exemption 6 to withhold meeting passcodes, telephone numbers, email address of otherwise identified senders and recipients, personal information of low-level JRC employees who were employees at the time the record was generated (except for one named employee), personal plans of defendants' employees, and medical information of current and former JRC patients that JRC previously submitted to the FDA, *see* JSR at 6, ECF No. 44.  Finally, on January 14, 2020, defendants released additional material previously withheld under Exemption 5 that they determined could be released. *See* Defs.' Mem., 2d Suppl. Decl. Sarah Kotler ("Kotler 2d Suppl. Decl.") ¶ 7, ECF No. 50-6; Mednick Suppl. Decl. ¶ 6.

In support of their instant motion, defendants have submitted a revised 651-page "Post-Summary Judgment *Vaughn* Index For Non-CDRH Records" ("non-CDRH Index") to support their withholdings, in whole or in part, of the non-CDRH records that they believe cures the errors identified in *JRC I*.  *See* Defs.' Mem., Ex. A, non-CDRH Index, ECF No. 50-3.  The non-CDRH Index identifies 1,626 disputed records and contains Bates-page ranges of the records

7

withheld in full or in part, the record's date, email participants if the record was an email, whether the document was withheld in full or in part, a description of the record, number of pages withheld, defendants' revised justifications for invoking Exemption 5 or Exemption 6, and the relationships between authors and recipients of records. *See* non-CDRH Index; Kotler 2d Suppl. Decl. ¶ 9; Mednick Suppl. Decl. ¶ 8; Recupero 2d Suppl. Decl. ¶ 8; Defs.' Mem., Decl. of Brandon J. Gaylord ("Gaylord Decl.") ¶¶ 7-8, ECF No. 50-13; Defs.' Mem., 2d Suppl. Decl. Richard Nicholls ("Nicholls 2d Suppl. Decl.") ¶ 7, ECF No. 50-10; Defs.' Mem., Suppl. Decl. Melissa Pickworth ("Pickworth Suppl. Decl.") ¶ 6, ECF No. 50-9; Defs.' Mem., Suppl. Decl. Eric F. Stein ("Stein Suppl. Decl.") ¶ 6, ECF No. 50-17.  Defendants also submitted historical organizational charts to show the organizational structure of relevant FDA components during the time period covered by responsive records and lists showing the positions held of senders and recipients during the relevant time period.  *See* non-CDRH Index; Defs.' Mem., Decl. Candace Boston ("Candace Decl.") ¶ 33, ECF No. 50-4; Kotler 2d Suppl. Decl. ¶ 10; Recupero 2d Suppl. Decl. ¶ 9; Pickworth Suppl. Decl. ¶ 7.

### 3.    *CDRH Records*

CDRH's Division of Information Disclosure, the division within CDRH responsible for processing and responding to FOIA requests for CDRH records, received plaintiffs' FOIA requests between August 2016 and February 2017.  Defs.' SMF ¶¶ 94-95.  Subject-matter experts from four CDRH offices—the Office of Compliance, the Office of Surveillance and Biometrics, the Office of Device Evaluation, and the Office of the Center Director—determined who within these respective offices was most likely to have responsive records in their possession, and those individual staff members then searched their paper and electronic files and provided any potentially relevant responsive records to CDRH's Division of Information Disclosure for review and production.  *Id.* ¶ 96.  CDRH's Division of Information Disclosure

also directed FDA's Office of Information Management and Technology to search the email
boxes of three former FDA employees using the search terms "JRC," Judge Rotenberg Center,"
"aversive," "ban," "Tristam Smith," "Gary LaVigna," "Fredda Brown," and "James Eason" and
provide potentially responsive records to CDRH's Division of Information Disclosure for review
and production.  *Id.* ¶ 97.

Pursuant to the bifurcation order, CDRH processed and released records on a rolling basis
between February 2018 and March 2020.  During this two-year period, CDRH produced: 5,114
pages on February 28, 2018; 10,001 pages on April 30, 2018; 10,016 pages on June 28, 2018;
10,024 pages on August 27, 2018; 10,097 pages on October 26, 2018; 10,091 pages on
December 21, 2018; 10,027 pages on April 1, 2019; 10,012 pages on May 30, 2019; and 9,261
pages on July 29, 2019.  *Id.* ¶¶ 97-107.  In addition, on August 16 and December 16, 2019,
CDRH released about 100 pages of records that had been referred to other offices or agencies for
review.  *Id.* ¶¶ 108-109.  Finally, on March 16 and 20, 2020, CDRH released certain less-
redacted versions of records previously withheld under Exemptions 4, 5, and 6, and produced
additional records that had been referred to other agencies.  *Id.* ¶¶ 110-112.

The parties agreed, *see* JSR at 8, ECF No. 44; JSR at 6, ECF No. 45, that defendants
could explain their redactions to a sample of CDRH records in a sample *Vaughn* Index, *see*
Defs.' Mem., Boston Decl., Attach. 1, Sample *Vaughn* Index for CDRH Records ("CDRH
Index").[5]  The CDRH Index provides the Bates-number range for each record, the date of each
record, whether the redactions are whole or partial, the reason for withholding an explanation for

---

[5]      As outlined in the joint status reports, the procedure called for defendants to obtain a sample of records
containing Exemption 5 withholdings by selecting certain records corresponding to certain pages of the CDRH
productions.  *See* JSR at 8-9, ECF No. 44, JSR at 7, ECF No. 45.  Defendants also agreed to index (1) all records
produced after July 29, 2019, (2) disputed withholdings under Exemption 6, (3) 200 additional records designated by
plaintiffs, and (4) disputed withholdings under Exemption 4.  *See* JSR at 8-10, ECF No. 44, JSR at 6-7, ECF No. 45.

each record, the number of pages withheld for each record, the relationship between sender and recipient and whether each record is a draft. *See* CDRH Index; Boston Decl. ¶¶ 35-36. The CDRH Index also sets forth the FOIA Exemptions defendants relied on for their withheld materials, which include Exemptions 4, 5, and 6. *See* CDRH Index; Boston Decl. ¶ 37.

### C.    Procedural History and Related Litigation

After partial grant and denial of the parties' cross-motions for summary judgment, *see generally JRC I*, 376 F. Supp. 3d 47, the FDA finalized its rule banning the use of GED to treat self-injurious or aggressive behavior on March 6, 2020. *See* Banned Devices; Electrical Stimulation Devices for Self-Injurious or Aggressive Behavior ("Final Rule"), 85 Fed. Reg. 13312-01 (March 6, 2020). In a separate proceeding, JRC challenged the Final Rule by filing a petition for review before the D.C. Circuit. *See generally JRC v. FDA*, 3 F.4th 390 (D.C. Cir. 2021). While JRC's challenge to the Final Rule was pending, and pursuant to the bifurcation order, defendants moved for summary judgment on all open issues in this FOIA action on May 4, 2020. The parties agreed, however, to stay proceedings because plaintiffs posited that resolution of their petition before the D.C. Circuit could obviate the need for further proceedings in this case. Pls.' Consent Mot. at 4, ECF No. 52. That motion was granted on August 24, 2020, staying proceedings in this matter, and the parties were directed to "file a joint status report within 14 days of the D.C. Circuit's decision . . . advising the Court whether further proceedings [were] necessary and, if so, proposing a schedule for further proceedings in this matter." Min. Order. (Aug. 24, 2020).

Nearly one year later, a split D.C. Circuit panel granted JRC's petition for review and vacated the Final Rule. *JRC*, 3 F.4th at 400. The majority held that 21 U.S.C. § 396, "which prohibits the FDA from regulating the practice of medicine," *id.* at 394, constrained the FDA's authority under 21 U.S.C. § 360f, "which authorizes the FDA to ban medical devices," *id.* After

analyzing the text of these statutes, the Court concluded that "once the FDA approves a device and then tries to ban it for specific uses, it defies the limitation that section 396 imposes." *Id.* at 398. Put simply, while the FDA is statutorily authorized to ban a medical device altogether, "the FDA lack[ed] the statutory authority to ban a medical device for a particular use." *Id.* at 400. In dissent, Chief Judge Srinivasan opined that because the statutory regime "grants the FDA power to impose a blanket ban on an unsafe device covering all its uses. . . . it is eminently reasonable . . . to conclude that the FDA may impose a more targeted ban focused solely on a device's unreasonably dangerous intended uses." *Id.* at 404 (Srinivasan, C.J., dissenting).

After granting four requests to extend the stay for the FDA to seek further judicial review of the D.C. Circuit's decision, *see* Min. Orders (July 23, 2021, Aug. 31, 2021, Sept. 22, 2021 and Dec. 6, 2021), and three additional requests to extend the stay for the parties to meet and confer to narrow the scope of their dispute, *see* Min. Orders (Mar. 8, 2022, May 10, 2022, June 23, 2022), the parties alerted the Court that, notwithstanding the D.C. Circuit's decision and their conferral, disputes between the parties remained, including, but not limited to, issues presented in the instant round of summary judgment briefing. *See generally* JSR, ECF No. 61. One peripheral dispute revolved around whether plaintiffs should be permitted to amend their complaint. *Id.* at 4-13. Prior to briefing the instant cross-motions, in the interest of judicial economy, the parties briefed plaintiffs' motion to amend their complaint, *see* Min. Order (July 15, 2022), and plaintiffs' motion to amend was denied, Min. Order (Nov. 1, 2022).

Thereafter, in accordance with the parties' proposal, a scheduling order was entered to govern the instant cross-motions for summary judgment. Min. Order (Dec. 1, 2022); JSR at 3, ECF No. 66. As part of the scheduling order, defendants, with plaintiffs' consent, filed a supplemental brief limited to addressing the foreseeable harm protected by the FDA's assertion

of FOIA exemptions in this case.  JSR at 2, ECF No. 66; Defs.' Suppl. Br. Supp. Summ. J.

("Defs.' Suppl."), ECF No. 67.  Following several requests for extensions by both parties, the

pending cross-motion for summary judgment are ripe for consideration.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 entitles a party to "summary judgment only if there is

no genuine issue of material fact and judgment in the movant's favor is proper as a matter of

law." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (citation omitted); *see

also* FED. R. CIV. P. 56(a).  Most FOIA cases "can be resolved on summary judgment."  *Brayton

v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

"Congress enacted [FOIA] 'to pierce the veil of administrative secrecy and open agency

action to the light of public scrutiny[]' . . . to 'achieve greater transparency in support of open

government.'"  *Insider Inc. v. Gen. Servs. Admin.*, 92 F.4th 1131, 1133 (D.C. Cir. 2024) (citation

omitted) (first quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 31-32 (D.C. Cir.

2018); and then quoting *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 895 F.3d 770, 783

(D.C. Cir. 2018)).  To find the appropriate balance between the public's interest in governmental

transparency and "legitimate governmental and private interests [that] could be harmed by

release of certain types of information," *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 913 F.3d

1106, 1108 (D.C. Cir. 2019) (quoting *FBI v. Abramson*, 456 U.S. 615, 621 (1982)), Congress

"provided that agencies may only withhold information that falls within one of the Act's nine

enumerated exemptions from disclosure," *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th

350, 357 (D.C. Cir. 2021), set forth in 5 U.S.C. § 552(b), which "are 'explicitly made exclusive'

and must be 'narrowly construed,'" *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (citation

12

omitted) (first quoting *EPA v. Mink*, 410 U.S. 73, 79 (1973); and then quoting *Abramson*, 456 U.S. at 630).

 "FOIA places the burden 'on the agency to sustain its action,' and the agency therefore bears the burden of proving that it has not 'improperly' withheld the requested records." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice,* 922 F.3d 480, 487 (D.C. Cir. 2019) (citation omitted) (first quoting 5 U.S.C. § 552(a)(4)(B); and then quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989)). "'An agency withholding responsive documents from a FOIA release bears the burden of proving the applicability of claimed exemptions,' typically through affidavit or declaration." *DiBacco v. U.S. Dep't of the Army*, 926 F.3d 827, 834 (D.C. Cir. 2019) (quoting *DiBacco v. U.S. Army* ("*DiBacco I*"), 795 F.3d 178, 195 (D.C. Cir. 2015)). "Summary judgment is warranted based on the agency's affidavit if it 'describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith.'" *Id.* (quoting *DiBacco I*, 795 F.3d at 196). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam) (quoting *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)).

## III.    DISCUSSION

Defendants have moved for summary judgment on six issues, five of which plaintiffs do not contest. Specifically, plaintiffs do not challenge defendants' motion for summary judgment as to whether defendants: (1) fully corrected the errors identified in *JRC I*; (2) conducted a reasonable search for CDRH records; (3) properly applied FOIA Exemption 4 to CDRH records;

(4) properly applied FOIA Exemption 6 to CDRH records; and (5) properly evaluated CDRH

records for segregability. Defs.' Reply at 1-2; Pls.' Opp'n at 2 ("All Plaintiffs hereby challenge

[are] Defendants' withholdings purportedly made pursuant to FOIA's Exemption 5, 5 U.S.C. §

552(b)(5)."). Accordingly, defendants are granted summary judgment as to those five issues.

*See Hopkins v. Women's Div., General Bd. of Glob. Ministries*, 238 F. Supp. 2d 174, 178

(D.D.C. 2002) (holding that when a plaintiff files an opposition addressing only certain

arguments raised by the defendant, "a court may treat those arguments that the plaintiff failed to

address as conceded" (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997))); *accord*

*Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) (upholding enforcement of

District Court rule "that if a party files an opposition to a motion and therein addresses only

some of the movant's arguments, the court may treat the unaddressed arguments as conceded"

(citations omitted)).

      In their cross-motion for summary judgment, plaintiffs challenge defendants' invocation

of Exemption 5 to protect information withheld based on the deliberative process and attorney-

client privileges. Notably, plaintiffs do not challenge any single entry in the non-CDRH Index or

CDRH Index. Instead, plaintiffs make a categorical challenge to defendants' invocation of

Exemption 5, arguing that Exemption 5's protection of the deliberative process and attorney-

client privileges does not, as a matter of law, apply to agency records regarding the proposal and

adoption of a final rule when a reviewing court vacates the rule after determining the agency

lacked statutory authority for its issuance. Pls.' Opp'n at 11-18. In this circumstance, according

to plaintiffs, the agency's conduct amounts to *"ultra vires* acts" and Exemption 5, particularly

the underlying deliberative process and attorney-client privileges, cannot "apply to records of

*ultra vires* actions," *id.* at 11**,** nor to the withholding of records by an agency that has "engag[ed]

in bad faith acts," *id.* at 18.  Plaintiffs further argue that defendants have failed to support their withholdings under Exemption 5 adequately to meet the FOIA Improvement Act's foreseeable harm standard.  *Id.* at 32-40.  Plaintiffs' arguments do not withstand scrutiny in the circumstances of this case, where the FDA indisputably has statutory authority to ban medical devices, though was found to have erred in the exercise of this authority.  *See JRC*, 3 F.4th at 394-95 ("Section 360f, which Congress passed in the Medical Device Amendments of 1976 to the Food, Drug, and Cosmetic Act, grants the FDA authority to ban medical devices.").

### A.    Defendants Properly Invoked Exemption 5 to Withhold Records Pursuant to the Deliberative Process and Attorney-Client Privileges.

FOIA's Exemption 5 authorizes agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  "As the text indicates—albeit in a less-than-straightforward way—this exemption incorporates the privileges available to Government agencies in civil litigation."  *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021).  "That list includes," as relevant here, "the deliberative process privilege [and the] attorney-client privilege."  *Id.*  The deliberative process privilege "protect[s] agencies from being 'forced to operate in a fishbowl'" and "shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."  *Id.* (first quoting *Mink*, 410 U.S. at 87; and then quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)).  To fall within the privilege, a record "must be both pre-decisional and deliberative."  *Abtew v. U.S. Dep't of Homeland Sec.*, c, 898 (D.C. Cir. 2015).  A predecisional document is one that is "'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made."  *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434

(D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grumman Aircraft*, 421 U.S. 168, 184 (1975)).

"Deliberative, in this context, means the record is 'a part of the agency give-and-take—of the

deliberative process—by which the decision itself is made.'" *JCR I*, 376 F. Supp. at 63 (quoting

*Abtew*, 808 F.3d at 899).

The attorney-client privilege, on the other hand, "protects confidential communications

from clients to their attorneys made for the purpose of securing legal advice or services," as well

as "communications from attorneys to their clients if the communications 'rest on confidential

information obtained from the client.'" *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997)

(quoting *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984)).  "In the governmental context, the

'client' may be the agency and the attorney may be the agency lawyer." *Id.*; *accord Coastal

States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980) (explaining that

attorney-client privilege applies when "the Government is dealing with its attorneys as would

any private party seeking advice to protect personal interests, and needs the same assurance of

confidentiality so it will not be deterred from full and frank communications with its

counselors").

Plaintiffs posit, first, that Exemption 5 is unavailable to withhold records regarding a

matter about which a reviewing court has decided an agency lacks the requisite statutory

authority to consider because Exemption 5's underlying deliberative-process and attorney-client

privileges do not cover records connected to "*ultra vires* acts," Pls.' Opp'n at 11-17, and, second,

that neither privilege is available if an agency is alleged to have engaged in "bad faith acts," *id*.

at 11-31.  These positions are unpersuasive on the facts in this case.

1.    *The D.C. Circuit's Decision Vacating the Final Rule Did Not Extinguish the Availability of Exemption 5 to the FDA.*

Plaintiffs argue that Exemption 5 does not "apply to records of *ultra vires* actions." Pls.' Opp'n at 11.  As a consequence, in their view, the D.C. Circuit's decision vacating the Final Rule because the "FDA[] lack[ed] . . . statutory authority" to ban the use of GED to treat self-injurious or aggressive behavior, *id.* at 13, nullifies defendants' invocation of Exemption 5 *in toto*, *id.* at 11-18.  Noting that the D.C. Circuit nowhere in its opinion on the Final Rule described the FDA as acting *ultra vires*, defendants counter that plaintiffs' "sweeping" conclusion is based on a "misread[ing]" of another D.C. Circuit opinion and that plaintiffs "fail to cite any persuasive or binding precedent that supports their position."  Defs.' Reply at 6.  Defendants are correct.

As an initial matter, plaintiffs' characterization of the FDA's rulemaking for the Final Rule as consisting of "*ultra vires* acts" merely because a majority of the D.C. Circuit panel vacated this rule upon finding the FDA lacked statutory authority to ban GEDs for particular uses, is a hyperbolic stretch for at least two reasons.  First, before the Circuit, plaintiffs did not argue for nor even seek formal *ultra vires* review of the Final Rule.  *See generally* Brief for Petitioner at 57-62, *JRC v. FDA*, 3 F.4th 390 (D.C. Cir. 2021) (No. 20-1087); *see also DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 508-09 (D.C. Cir. 2019) (describing the requirements for *ultra vires* review of an agency action as originating in *Leedom v. Kyne*, 358 U.S. 184 (1958), and applying "only when three requirements are met: '(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.'" (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009))).  The law is well settled that "an *ultra vires* challenge is distinct from statutory review of an agency action taken 'within the

17

agency's jurisdiction,' and is available only for the narrow purpose of obtaining injunctive relief against agency action taken 'in excess of its delegated powers and contrary to a specific prohibition' in the law." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (brackets omitted) (quoting *Kyne*, 358 U.S. at 188). Unsurprisingly, therefore, the D.C. Circuit's review, under the Administrative Procedure Act, of the FDA's Final Rule never described the rule or the rulemaking process underlying that rule as "*ultra vires*," *see generally*, *JRC*, 3 F.4th 390, making apparent that plaintiffs read far too much into the panel's holding by describing the FDA's rulemaking process in that way.

Second, the D.C. Circuit has explained that the third *Kyne* requirement for a finding that an agency's acts were *ultra vires* is confined "to agency error so extreme that one may view it as jurisdictional or nearly so." *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988). Thus, *ultra vires* review "covers only 'extreme' agency error, not merely 'garden-variety errors of law or fact.'" *DCH Reg'l*, 925 F.3d at 509 (brackets omitted) (quoting *Griffith*, 842 F.2d at 493). The D.C. Circuit panel, while split on the ultimate holding regarding the Final Rule, unanimously understood that the FDA had the statutory authority to "ban a device completely" or "decline to approve a device in the first instance." *JRC*, 3 F.4th at 398; *see id.* at 400 (Srinivasan, C.J., dissenting). Neither the majority nor dissent critiqued, questioned, or otherwise viewed that the FDA engaged in an invalid *exercise* of its rulemaking power, and the majority held only that the agency reached the wrong result in banning GEDs to treat self-injurious and aggressive behaviors. *See generally JRC*, 3 F.4th 390. In the end, even assuming *arguendo* that the FDA's Final Rule could be considered a form of "*ultra vires*" act, the process by which the FDA reached that erroneous conclusion fell lawfully within the agency's statutory authority, undermining plaintiffs' arguments that Exemption 5 is inapplicable here.

Compounding the initial mistake in labeling the entirety of the FDA's process as *ultra vires*, plaintiffs' argument that the D.C. Circuit's ruling that the FDA lacked the statutory authority to ban GEDs for a particular use voided its ability to invoke Exemption 5 stems from a highly strained reading of a nearly fifty-year-old D.C. Circuit decision in *Weismann v. CIA*, 565 F.2d 692 (D.C. Cir. 1977).  *See* Pls.' Opp'n at 12 (citing *Weissman* and stating "[t]he D.C. Circuit has precluded an agency from availing itself of a FOIA exemption in order to avoid disclosing records concerning *ultra vires* acts").  In *Weismann*, the D.C. Circuit rejected the CIA's invocation of FOIA's Exemption 7, 5 U.S.C. § 522(b)(7), which "shields from disclosure certain records for law-enforcement purposes," 565 F.2d at 694, to withhold records regarding its investigation into the plaintiff, an American citizen living in the United States, to determine whether he was a safe candidate for recruitment by the agency, *id.* at 695.  Pointing to language in the CIA's organic statute that "specifically provided that the 'Agency shall have no police, subpoena, law-enforcement powers, or internal-security functions,'" *id.* (quoting 50 U.S.C. § 403(d)(3)), the Court found this "directive was intended, at the very least, to prohibit the CIA from conducting secret investigations of United States citizens, in this country, who have no connection with the Agency," *id.*  As such, the "full background check within the United States of a citizen who never had any relationship with the agency" *id.* at 696, could not qualify as having "law-enforcement purposes," *id.* at 695.  Consequently, the CIA could not invoke Exemption 7 to withhold the records.  *Id.* at 695-96.

Plaintiffs analogize *Weissman* to apply to the facts of this case, contending that "like the agency in *Weissman*, FDA attempted to regulate an area which Congress had expressly and unambiguously prohibited and that is the traditional province of the states."  Pls.' Opp'n at 16; *see also* Pls.' Reply Supp. XMSJ ("Pls.' Reply") at 6 ("Per *Weissman*, because FDA did not have

authority to deliberate on the matter, Defendants cannot assert the deliberative-process privilege over those communications."). *Weissman*, however, does not sweep so broadly as to swallow Exemption 5's protections where, as here, an agency conducts a statutorily authorized and complete rulemaking but reaches an erroneous conclusion in a Final Rule based on a colorable interpretation of its organic statute, as confirmed by the divided panel of the D.C. Circuit. *See JRC*, 3 F.4th at 400-04 (Srinivasan, J., dissenting).

Plaintiffs' position faulters out of the gate because at issue in *Weissman* was the CIA's statutory bar to satisfying Exemption 7's threshold, statutory requirement that records must be compiled for law enforcement purposes, *see* 5 U.S.C. § 552(b)(7) (requiring, as a threshold matter to invoke Exemption 7, that "records or information [be] compiled for law enforcement purposes"), and that is fundamentally different from Exemption 5's statutory protection for records falling within "the privileges available to Government agencies in civil litigation," *Sierra Club*, 592 U.S. at 267. The Seventh Circuit has addressed the interplay between *Weissman*'s holding and an agency's invocation of Exemption 5 in *Enviro Tech Int'l, Inc. v. EPA*, 371 F.3d 370 (7th Cir. 2004), and this Court finds persuasive the conclusion reached there that "it is not immediately apparent that *Weissman's ultra vires* rationale would translate readily into the latter context." *Id.* at 376. Exemption 7 at "issue in *Weissman* was confined to a particular activity— law enforcement—in which the CIA was expressly forbidden to engage." *Id.*; *see also Founding Church of Scientology of Wash., D.C., Inc. v. Regan*, 670 F.2d 1158, 1162 n.29 (D.C. Cir. 1981) (listing *Weissman* as a case where the D.C. Circuit "explored" "[t]he nature of the 'law enforcement purposes' requirement"). "The formulation of policy," *Enviro Tech*, 371 F.3d at 376, or legal advice given to an agency by legal counsel, "by contrast, is not something that is foreclosed to . . . any . . . agency," *id. Weissman*, thus, "does not put into doubt the [agency's]

20

ability to invoke the . . . privilege[s]" protected by Exemption 5. *Id.* While closer calls may exist, as already stated, the FDA at all times relevant here possessed the authority to ban medical devices, *see JRC*, 3 F.4th at 398, and merely because the agency came to an improper conclusion after a lawful rulemaking process does not fit *Weissman*'s mold.

If the blanket holding regarding Exemption 5 that plaintiffs urge based on *Weissman* is rejected here, plaintiffs alternatively insist that the D.C. Circuit's opinion vacating the Final Rule "void[ed]" "all 'decisions' concerning the rulemaking . . . *ab initio*," rendering all decisions the FDA made in its rulemaking process "legal nullit[ies]." Pls.' Opp'n at 14. This, in plaintiffs' view, means that an agency cannot invoke Exemption 5's protection of the deliberative process privilege, *id.* at 13, because the privilege is inapplicable to "*ultra vires* 'decisions'" as no "'decisions' . . . existed as a matter of law" "to pinpoint any agency decision or policy to which the document contributed," *id.* at 14 (quoting *JRC I*, 376 F. Supp. 3d at 65). Yet, whether a "decision" exists for purposes of application of the deliberative process privilege does not necessarily turn on a reviewing court's critique of the agency action. Rather, as precedent makes clear, this privilege requires that the documents be "'predecisional,'" meaning that "they were generated before the agency's *final decision on the matter*," and that they "are 'deliberative,'" capturing those records that "were prepared to help the agency *formulate its position*." *Sierra Club*, 592 U.S. at 268 (emphasis added). While the D.C. Circuit concluded that "the FDA lacks the statutory authority to ban a medical device for a particular use," *JRC*, 3 F.4th at 400, nothing about that judicial holding undermines the natural conclusion that the Final Rule was, in fact, an agency "decision," albeit one that turned out to lack statutory authority, *see id.*, or that the agency engaged in a number of other intermediary decisions in the rulemaking process, *see*

*Sierra Club*, 592 U.S. at 266 ("The deliberative process privilege shields documents that reflect an agency's preliminary thinking about a problem.").

Doubling down on their crusade against the availability of Exemption 5's protection for attorney-client privilege, in particular, to withhold records regarding an agency action that the agency has been found to have taken without statutory authority, plaintiffs argue that "where an agency employee pursues *ultra vires* activities, he is not acting as a government agent." Pls.' Opp'n at 17. As support for this argument, plaintiffs rely on cases applying the *Larson-Dugan* exception to sovereign immunity and holding that "'suits for specific relief against officers of the sovereign' allegedly acting 'beyond statutory authority or unconstitutionally' are not barred by sovereign immunity." *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1963)); *see* Pls.' Opp'n at 17 (citing *Pollack*, 703 F.3d 117, and *Larson*, 337 U.S. 682). Plaintiffs reason that, like the *Larson-Dugan* exception, an "agency employee is not acting on behalf of the agency client of the agency attorney," when a court has determined that an agency lacked authority to issue a final rule, and thus, "the [attorney-client] privilege," which is held by the agency-client, "cannot be invoked" as a matter of law. Pls.' Opp'n at 17.

By this logic, plaintiffs seek to import the *Larson-Dugan* exception to sovereign immunity, which, if applied, subjects a government employee to injunctive relief, into a totally different context to create an exception to the attorney-client privilege otherwise held by an agency when agency employees reach a legally erroneous conclusion. This reasoning is fatally flawed. In the former context, the sovereign itself never suffers a loss of immunity because in circumstances where the *Larson-Dugan* exception is applied due to employees' *ultra vires* conduct "there is no sovereign immunity to waive—it never attached in the first place." *Leopold*

*v. Manger*, 102 F.4th 491, 494 (D.C. Cir. 2024) (internal quotation marks omitted) (quoting *Chamber of Com. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996)).  By contrast, in the latter context, plaintiffs' position would result in an agency's loss of the attorney-client privilege that otherwise undoubtedly applies when employees consult with agency counsel about actions to take on behalf of the agency, any time a reviewing court subsequently determines the agency employees and agency counsel made an incorrect call.  While not perfectly analogous, this is akin, in the sovereign immunity context, to a government employee engaging in tortious conduct but, even in that context, "if the actions of an officer do not conflict with the terms of his valid statutory authority, then they are the actions of the sovereign, whether or not they are tortious under general law."  *Larson,* 337 U.S. at 695; *see also Leopold*, 102 F.4th at 496 ("*Larson*'s instruction is clear: Courts can enjoin or direct the actions of a government official, so long as that action is not also the action of the sovereign." (citation and internal quotation marks omitted)).  Nothing in the D.C. Circuit's opinion vacating the Final Rule suggests that the work FDA employees performed in the rulemaking process was done on any basis but on behalf of the agency.  *See JRC*, 3 F.4th at 394-95 (describing the FDA's authority to engage in the rulemaking that took place in this case); *id.* at 401-02 (Srinivasan, C.J., dissenting) (same).  That the specific rule promulgated was subsequently found to be beyond the FDA's authority does not make the internal deliberations any less subject to the privileges afforded to the agency.

Plaintiffs offer various policy rationales to support their position that Exemption 5 is unavailable in this case.  Summed up, plaintiffs argue that "[t]here is no reason to 'protect the process' by which an agency arrives at an *ultra vires* policy because the agency has no lawful reason to engage in that process or arrive at that policy."  Pls.' Opp'n at 15.  Not so.  "Along the way to formulating a policy that is within its power to implement, an agency might legitimately

identify and consider a host of alternatives, some within the agency's power to effectuate and some without." *Enviro Tech*, 371 F.3d at 376. For example, an "agency might . . . consider the boundaries of its own jurisdiction," *id.*, and "the need for staff to speak candidly and confidentially is perhaps most important when the discussion concerns unmapped and unexplored terrain at the border of agency authority." *Competitive Enter. Inst. v. U.S. Dep't of Treasury*, 308 F. Supp. 3d 109, 118 (D.D.C. 2018). A backwards-looking test that nullifies Exemption 5's protection of the deliberative process, which may include conversations with attorneys, would "discourage the kind of frank and appropriate policymaking discussions that the privilege[s] [were] meant to protect and promote." *Enviro Tech*, 371 F.3d at 376. Rather than lend support to plaintiffs' position, policy considerations thus demonstrate the need for agencies to retain the ability to invoke Exemption 5's protections even when a reviewing court subsequently concludes an agency rule was not statutorily authorized.

### 2.    *Plaintiffs' "bad faith" arguments fail.*

Plaintiffs further argue that defendants' application of Exemption 5 should be nullified because the deliberative process and attorney-client privileges are unavailable "to an agency engaging in bad faith acts" or "when regulators engage in misconduct." Pls.' Opp'n at 18. Notably, plaintiffs raise no accusation of bad faith at any stage of this case, not in the preparation of the voluminous and detailed *Vaughn* indices or in multiple declarations submitted as part of the extensive record. Instead, as factual support for this argument, plaintiffs spill much ink over ten pages in their brief airing grievances against the FDA and citing instances they describe as misconduct in the rulemaking process. *Id.* at 18-28. The result of this government misconduct in the rulemaking process, in plaintiffs' view, is that defendants should be precluded from withholding records otherwise shielded by the deliberative process privilege and warrants application of the crime-fraud exception to the attorney-client privilege. Defendants counter that

"the government misconduct exception" is "a legal doctrine that this Court has held does not apply to FOIA cases," Defs.' Reply at 12-13 (citing *Wright v. Admin. for Children & Families*, No. 15-cv-218 (BAH), 2016 WL 5922293, at *11 (D.D.C. Oct. 11, 2016)), and that the crime-fraud exception is inapplicable because nothing about the FDA's rulemaking was illegal or evidences any misconduct, *id.* at 15.

Plaintiffs appear to have imported arguments made in challenging the legality of the Final Rule to support their view here that the FDA engaged in bad faith in its rulemaking. *See, e.g.*, Pls.' Opp'n at 19 (describing that the FDA strained its efforts to ban GED for the use of treating self-injuring behavior); *id.* at 20 ("FDA failed to disclose . . . material facts in its rulemaking"); *id.* at 21 (arguing that the FDA failed to disclose meeting and communications in the Federal Register notice announcing the Proposed Rule); *id.* at 23 ("During the rulemaking, FDA rejected or ignored evidence that did not support a ban."); *id.* at 24-29 (making similar arguments). Plaintiffs submitted those arguments to the D.C. Circuit, *see* Brief for Petitioner at 57-62, *JRC v. FDA*, 3 F.4th 390 (D.C. Cir. 2021) (No. 20-1087), and with the benefit of an administrative record, the D.C. Circuit ruled only that the FDA lacked authority to issue the Final Rule, *see generally JRC*, 3 F.4th 390. Nothing in the record before this Court, which does not have the benefit of the administrative record in the rulemaking process, provides a basis to find that exceptions to the deliberative process or attorney-client privileges for either government misconduct or crime-fraud, respectively, should be applied here, even if those exceptions were available in evaluating the applicability of Exemption 5.[6]

---

[6]    In the context of FOIA's Exemption 5, the D.C. Circuit has not opined on the existence of a "government misconduct exception" to the deliberative process privilege that would apply "where there is reason to believe . . . [that the] documents may shed light on government misconduct." *In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997); *see Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 889 n.3 (D.C. Cir. 2021) ("[I]n light of [the Court's] statement in *In re Sealed Case* that FOIA requests cannot overcome the deliberative process privilege . . . the court need not resolve that issue here."). Even if the government misconduct exception applied in FOIA cases, the standard would not be met here. The standard requires "nefarious" conduct or behavior that constitutes

\*\*\*

Plaintiffs' cross-motion for summary judgment that defendants, as a matter of law, cannot invoke Exemption 5 to withhold records, in full or in part, based on the deliberative process and attorney-client privileges because of the D.C. Circuit's vacatur of the Final Rule or alleged "bad faith acts" is denied, and defendants' motion for summary judgment is granted.[7]

### B.    Defendants Have Satisfied the Foreseeable Harm Standard.

The FOIA Improvement Act provides that "even if an exemption applies, the agency may withhold the record only if it 'reasonably foresees that disclosure would harm an interest protected' by the exemption." *Emuwa v. U.S. Dep't of Homeland Sec.*, 113 F.4th 1009, 1013 (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)).  This requirement has been termed the "foreseeable harm requirement," which "imposes an independent and meaningful burden on agencies."  *Reps. Comm.*, 3 F.4th at 369 (brackets omitted) (quoting *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019)).  "In the context of

---

"policy discussions . . . so out of bounds that merely discussing them was evidence of a serious breach of the responsibility of representative government."  *ICM Registry, LLC v. Dept. of Com.*, 538 F. Supp. 2d 130, 133 (D.D.C. 2008) (relying on decisions that discussed the government misconduct exception in non-FOIA contexts and decisions that opined on, but declined to apply, the exception in the FOIA context).  Here, given that the FDA was statutorily authorized to ban medical devices, *see JRC*, 3 F.4th at 394-95, the FDA's discussions and rulemaking regarding a ban of GEDs for particular uses was not "so out of bounds" or "nefarious" to warrant applying the exception here.  Indeed, nothing in the D.C. Circuit's majority or dissenting opinions regarding the Final Rule or rulemaking process suggests that the FDA engaged in any bad faith behavior.  *See id.* at 398 ("In this case . . . no one disputes that section 360f permits the FDA to ban a device completely. The FDA could even decline to approve a device in the first instance. The problem is that once the FDA approves a device and then tries to ban it for specific uses, it defies the limitation that section 396 imposes.").  Similarly, plaintiffs' urging to find that agency staff communications with the agency lawyers were made in furtherance of "a crime, fraud, other misconduct," Pls.' Reply at 15 (quoting *In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007), *see also* Pls.' Opp'n at 31, to pierce the agency's attorney-client privilege, simply finds no traction in the record of this case.

[7]    In the event they prevailed in barring defendants from invoking Exemption 5, as a matter of law, plaintiffs sought reconsideration of the prior partial grant of summary judgment to defendants as to the withholding of non-CDRH records on the exact same grounds. Pls.' Opp'n at 11.  For the same reasons stated, *supra* Part III.A.-B., plaintiffs' request for reconsideration is denied because they have failed to identify "an 'intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice,'" *see Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 17 (D.C. Cir. 2015) (quoting *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012)).

withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." *Id.* at 369-70 (quoting *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020)). "While agencies may sometimes satisfy that burden on a category-by-category basis rather than a document-by-document basis—that is, group together like records and explain the harm that would result from release of each group—the basis and likelihood of that harm must be independently demonstrated for each category." *Id.* (citation and internal quotation marks omitted). The alleged foreseeable harm can be supported by declarations, a *Vaughn* index, or a combination of both, *see, e.g.*, *Keeping Gov't Beholden, Inc. v. Dep't of Justice*, No. 17-cv-1569 (FYP), 2021 WL 5918627, at *11 (D.D.C. Dec. 13, 2021), *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 107, and is "context specific," *Reps. Comm.*, 3 F.4th at 369. Indeed, "even without a sufficient explanation from the agency, the 'context and purpose' of withheld information can support a finding of foreseeable harm." *Reps. Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*, 567 F. Supp. 3d 97, 110 (D.D.C. 2021) (quoting *Reps. Comm.*, 3 F.4th at 372).

Plaintiffs challenge the adequacy of defendants' showing of compliance with the FOIA Improvement Act's foreseeable harm standard with respect to Exemption 5 withholdings based on the deliberative process privilege for both CDRH records and non-CDRH records for which defendants were denied partial grant of summary judgment in *JRC I*. Specifically, plaintiffs contend that no "reasonably foreseeable harm" can result from releasing records regarding *ultra vires* rulemaking, Pls.' Opp'n at 33-34, and posit that even if harm could flow from releasing records from *ultra vires* rulemaking, defendants' descriptions of the harm are too general and boilerplate to withstand scrutiny, *id.* at 35-37. Defendants counter that the *Vaughn* indices,

27

which plaintiffs do *not* challenge as being insufficient, coupled with the defendants'
supplemental brief and accompanying declaration, specifically describe that releasing records
"would" chill the FDA's "frank consideration of sensitive and complex regulatory issues that
accompany regulation of devices."  Defs.' Suppl. at 5; *see id.*, Supp. Candace Boston Decl.
("Supp. Boston Decl.") ¶¶ 15-24, ECF No. 67-1.  After addressing plaintiffs' over-arching
challenge that defendants are simply unable to meet the foreseeable harm standard where the
Final Rule was vacated by a reviewing court, the specific critiques raised are considered, and
rejected.

Plaintiffs dismiss the detailed explanations submitted by defendants as meeting the
foreseeable harm standard and assert that defendants cannot demonstrate the "harm they
reasonably foresee would result from the disclosure of information about their *ultra vires*
rulemaking," Pls.' Opp'n at 33, because any *ultra vires* "agency deliberations going forward"
will also be a legal nullity and so cannot be "impede[d]" by disclosure, *id.* (quoting *Reps.
Comm.*, 3 F.4th at 370).  This position that no foreseeable harm can exist here because the
majority on a D.C. Circuit panel determined that the FDA lacks statutory authority to ban GED
for particular uses, *JRC*, 3 F.4th at 400, rests on an overbroad reading of one sentence in the D.C.
Circuit's opinion in *Reps Comm.*, 3 F.4th 350.  *See* Pls. Opp'n at 33-34.

In *Reps. Comm.*, the D.C. Circuit opined that to meet the foreseeable harm standard for
invoking the deliberative process privilege an agency "need[s] a focused and concrete
demonstration of why disclosure of the particular type of material at issue will, in the specific
context of the agency action at issue, actually impede those same agency deliberations going
forward."  *Reps. Comm.*, 3 F.4th at 370.  In plaintiffs' view, this means that because the Circuit
held that the FDA lacks authority to ban GED for particular uses, disclosure of the deliberative

process materials cannot "impede" the FDA's "same agency deliberations going forward."  Pls.'

Opp'n at 34 (quoting *Reps. Comm.*, 3 F.4th at 370).  By this logic, plaintiffs would have the D.C.

Circuit, through the power of this single sentence, interpret the foreseeable harm standard as

nullifying the entirety of the deliberative process privilege over records, otherwise protected by

the privilege, because an agency learned *ex post facto* that it lacked authority to pass a rule.  Such

a reading risks leaving the deliberative process privilege an empty vessel.  Agencies would not,

and likely could not, rigorously deliberate if a reviewing court's decision on the legality of a

final rule operated as an on/off switch of the deliberative process privilege.  Such an

interpretation of the foreseeable harm standard would threaten the very "quality of agency

decisions," *Sears,* 421 U.S. at 150, which the deliberative process privilege is meant to protect.

Indeed, the deliberative process privilege rests on forward-looking beliefs that agencies "craft

better rules when their employees can spell out in writing the pitfalls as well as strengths of

policy options, coupled with the understanding that employees would be chilled from such

rigorous deliberation if they feared it might become public," *Judicial Watch, Inc. v. U.S. Dep't

of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017), and that agencies "should be judged by what they

decided, not for matters they considered before making up their minds," *Nat'l Sec. Archive v.

CIA*, 752 F.3d 460, 46-63 (D.C. Cir. 2014).

Regardless, even if plaintiffs' reading of *Reps. Comm.* were accurate, Congress amended

21 U.S.C. § 360f, the statute governing FDA's authority to ban devices, to clarify that the FDA

can ban a "device for one or more intended uses," and such a device "is not a legally marketed

device under section 396 of this title when intended for such use or uses."  21 U.S.C. §

360f(a)(2).  Pursuant thereto, the FDA is currently deliberating another proposed ban, *see*

Banned Devices; Proposal to Ban Electrical Stimulation Devices for Self-Injurious or Aggressive

Behavior, 89 Fed. Reg. 20882 (proposed Mar. 26, 2024) (to be codified 21 C.F.R. pts. 882, 895). As such, defendants are engaging in "the same agency deliberations" on which the withheld records relate.

Plaintiffs' specific arguments against defendants alleged harms fare no better. In this case, defendants have withheld as protected by the deliberative process privilege two categories of records: (1) "drafts" ("category 1") and (2) "memoranda, email exchanges, and other non-draft records," ("category 2"). Defs.' Mem. at 14-18; Defs.' Suppl. at 6-10; Supp. Boston Decl. ¶¶ 15, 19. Plaintiffs contest the reasonably foreseeable harm defendants observe could flow from releasing records from each category. Pls.' Opp'n at 35-37.

With respect to documents that fall within category 1, the FDA argues that release of the information "would confuse the public" because "the public would mistake preliminary drafts as final agency policy." Supp. Boston Decl. ¶ 18. While alone, plaintiffs would be correct that this is "far too general and boiler plate" for defendants to satisfy their burden, Pls.' Opp'n at 35, because "[r]ead in isolation, [this] description[] largely fail[s] to link the asserted harms to the 'specific information contained in the material withheld," *Keeping Gov't Beholden,* 2021 WL 5918627, at *11 (citation and internal quotation marks omitted). When considered in conjunction with the context of FDA rulemaking and the non-CDRH Index and CDRH Index, however, "the overall picture is sufficient to illustrate how the agency's deliberations in particular would be harmed by disclosure." *Id.*

To begin with, "[t]he FDA is an expert, public health agency. Its pronouncement that a product is safe or unsafe has serious consequences." *Juul Labs, Inc. v. FDA*, 731 F. Supp. 3d 46, 72 (D.D.C. 2024). Here, the description of draft documents in the *Vaughn* indices, in combination with the affidavit, demonstrate particularized, foreseeable harm of public confusion

regarding the safety of medical devices. For example, CDRH Index entry numbers 537, 553, 785, and 794-95 are described as draft versions of the FDA's Final Rule, which, if released, "would confuse the public," Supp. Boston Decl. ¶ 18, as the FDA's final agency policy on GEDs. *See, e.g.*, CDRH Index Entry Nos. 537, 553, 785, 794-95. The same is true for draft documents, letters, memoranda, etc., relaying thoughts, opinions, analyses in the rulemaking process, none of which relay the FDA's decision regarding the safety or propriety of GEDs, electronic stimulation devices, or banning GED to treat certain behaviors. *See* CDRH Index Entry No. 1 (draft table of articles containing agency staff's comments and analysis of those articles); *id.* at Entry Nos. 22, 26 (draft memorandum and consult review containing staff's thoughts, impressions, opinions, and analysis regarding whether FDA should take any future action following JRC's responses to the agency); *id.* at Entry Nos. 29-31, 45, 48 (draft Health Risk Assessments containing staff's thoughts, impressions, opinions, and analysis of whether a new device application was required). The detailed descriptions of draft records in the CDRH Index in conjunction with the affidavit, and the stakes involved in the FDA's official pronouncement of the safety of medical devices, "explain[] why the information contained in the withheld drafts would confuse the public in such a way to undermine the agency's internal processes." *Juul Labs*, 731 F. Supp. 3d at 74. As such, defendants have satisfied the foreseeable harm standard for records that fall within category 1.

As to documents that fall within category 2, the FDA argues that disclosure "would harm FDA's ability to openly and freely communicate about sensitive and complex regulatory issues that accompany regulation of devices." Supp. Boston Decl. ¶ 21. Further, the FDA argues that "it is foreseeable that companies would attempt to leverage perceived disagreements within FDA for private or financial gain, potentially at the expense of the public health," *id.*, and that

"[d]isclosure of these communications would adversely affect the public's understanding of key messages regarding FDA's regulation of [electric stimulation devices]," *id.* Plaintiffs complain that these harms are perfunctory and generalized statements. Pls. Opp'n at 35. To the contrary, these harms "specifically focus[] on the information at issue" regarding the FDA's regulation of GEDs and then "conclude[] that disclosure of that information 'would' chill future discussions." *Machado Amadus*, 971 F.3d at 370. The harm does not mirror the general underlying justifications for invoking the deliberative process privilege nor describe "abstract fears," *see, Reps. Comm.*, 3 F.4th at 369-70, and thus, defendants have satisfied the foreseeable harm standard for documents in category 2.

Accordingly, plaintiffs' cross-motion for summary judgment that defendants have failed to support their Exemption 5 withholdings with the requisite showing of reasonably foreseeable harm is denied, and defendants' motion for summary judgment as to this issue is granted.

## IV.    CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted, and plaintiffs' cross-motion for summary judgment is denied. An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: February 25, 2025

_____
**BERYL A. HOWELL**
United States District Judge